

**SO ORDERED.**

**SIGNED this 15 day of November, 2005.**

_____
                    ROBERT E. NUGENT
    UNITED STATES CHIEF BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| **HERTZLER HALSTEAD HOSPITAL,** | ) | **Case No. 02-13080** |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ ) | | |
| | ) | |
| **W. TERRENCE BROWN,  Trustee For the** | ) | |
| **Bankruptcy Estate of Hertzler Halstead Hospital,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **Adversary No. 04-5142** |
| | ) | |
| **LESLIE KITCHENMASTER and** | ) | |
| **KOT, INC.,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ ) | | |

## <u>MEMORANDUM OPINION</u>

W. Terrence Brown, chapter 11 trustee of the bankruptcy estate of Hertzler Halstead Hospital

1

Corporation, sued Leslie Kitchenmaster and his company, KOT, Inc., under 11 U.S.C. § 547 and § 548 to avoid and recover alleged preferential and fraudulent transfers made to them by the debtor prior to the date of debtor's bankruptcy petition.[1]  This Court appointed Mr. Brown chapter 11 trustee in this case on January 10, 2003 on the joint motion of the debtor and the Official Unsecured Creditors Committee after significant financial irregularities in the debtor's operations were brought to light.[2]

The parties submitted detailed stipulations of fact within the pretrial order[3] and, after a day-long trial in which numerous documentary exhibits were received, the Court is now ready to rule.

## JURISDICTION

This avoidance proceeding is a core proceeding over which the Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(F) and (H) and 28 U.S.C. § 1334(b).

## FACTUAL BACKGROUND

### The Debtor

Hertzler Halstead Hospital Corporation ("Hospital") is a not-for-profit corporation that operated a hospital and medical clinic in the city of Halstead, Kansas for a number of years prior to filing bankruptcy.  The Hospital experienced significant financial distress from at least 2000 on.[4]

---

[1]  Unless otherwise specified, all future statutory references in the text are to Title 11 of the United States Code.

[2]  The order temporarily appointing Mr. Brown the chapter 11 trustee became final on January 24, 2003. Dkt. 262.

[3]  Dkt. 35.

[4]  Mr. Brown linked the hospital's demise to fundamental changes in the manner in which health care costs were reimbursed after passage of the Omnibus Budget Reconciliation Act of 1995.  According to Mr. Brown, that legislation weeded out inefficiently run health care facilities.

2

On August 23, 2001, defendant Leslie Kitchenmaster, acting through a corporation he controlled, Peak Management Corporation, entered into a Management Services Agreement with the Hospital and The Hertzler Research Foundation.  Under the agreement, Peak was to manage the Hospital with the advice and consent of a board of trustees.  Peak  was to "assume the financial and managerial responsibility for the continuing operations of Halstead Hospital and the Hertzler Clinic" and, at signing, Peak invested and escrowed $500,000 in the Tampa State Bank of Tampa, Kansas, to cover any cash flow shortages the Hospital might experience during Peak's incumbency.  In return, Peak received an option to acquire the Hospital for $1.00 and the absolute assumption of all of the Hospital's pre-January 31, 2002 liabilities.[5]  On November 13, 2001, Peak exercised its option and became the owner of the Hospital.  Kitchenmaster became the acting chief executive officer of the Hospital.

Prior to August 23, 2001, and because of the Hospital's ongoing financial distress, its employees had been served a WARN Act[6] notice advising them that the facility would be closed imminently.  Kitchenmaster was advised that the Hospital would be filing bankruptcy.  Through Kitchenmaster's and Peak's intervention and resulting acquisition of the facility, it remained open

_____

[5] Prior to entering into the Management Services Agreement with the Hospital, Kitchenmaster personally inspected the facility.  He did not, however, obtain an appraisal of the debtor's real or personal property prior to signing the agreement or exercising the option. Kitchenmaster understood, based upon his review of the books and records of the Hospital, that the Hospital owed debts of roughly $6.5 million, of which $3.5 million was owed to vendors and $3 million owed on judgments or pending lawsuits against the Hospital.  At the time the agreement was signed, the Hospital was incurring monthly operating losses of $200,000. *See* Pretrial Order, p. 6-7.

[6] Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101, *et seq*.

and the employees remained employed. Unfortunately, the Hospital's operations did not improve. The Hospital, which had accommodations for 227 patients, frequently had a census of 10 or fewer inpatients and many doctors left. By the fall of 2001, the operation had exhausted the $500,000 in escrow.[7]

### The Transfers

Because the bi-weekly employee payroll needed to be met and because no bank would lend into what was already a desperate financial situation, Kitchenmaster made a series of short-term advances to the Hospital. He borrowed $100,000 on his signature from the Halstead Bank. He gave the Bank a note dated November 29, 2001, loan number 40032263. Kitchenmaster directed that the loan proceeds be deposited in the Hospital's checking account at Halstead Bank on November 29, 2001. After the payroll was covered and the Hospital collected receivables in early December, Kitchenmaster (now acting as chief executive officer of the Hospital) directed that $50,106.16 be transferred from the Hospital account to Halstead Bank in partial repayment of his loan. Another Kitchenmaster-related entity paid off the balance of Kitchenmaster's loan with Halstead Bank.[8]

Two weeks later, on December 13, 2001, Kitchenmaster took out another $100,000 personal loan from Halstead Bank, note number 40032285, and again deposited the proceeds into the Hospital's checking account at Halstead Bank. These funds were also used to defray payroll expense. On January 24, 2002, Kitchenmaster directed the debtor to repay the Bank the $100,000

---

[7] The funds were released from escrow and spent during the two month period between late September and late November, 2001.

[8] Loan number 40032263 matured five (5) days after it was made, December 4, 2001. The $50,106.16 transfer to Halstead Bank occurred on December 4.

4

principal obligation evidenced by note number 40032285.[9]

On January 28, 2002, at Kitchenmaster's direction, debtor paid $100,000 to KOT, Inc., a corporation principally owned and controlled by Kitchenmaster, $50,000 of which was intended to repay Kitchenmaster's $50,000 payment on the first Bank loan and the remaining $50,000 to remain in what he characterized as the "kitty" for future payroll needs of the Hospital.[10]

On May 2, 2002, Kitchenmaster took out a third personal loan from the Halstead Bank, note number 40032461, and deposited the loan proceeds, $100,000, in the Hospital's checking account, again intended as a personal loan for the Hospital's payroll.[11] Then, on May 30, he wrote debtor a personal check for another $40,000 to cover the principal portion of a payroll (without withholding taxes or employee benefit payments). On May 31, at his direction, the Hospital paid KOT $38,000, all the cash it could spare, to repay in part the $40,000 advance. On June 14, the Hospital paid Kitchenmaster $50,000 in partial satisfaction of the May 2 advance. On June 21, the Hospital paid Kitchenmaster $50,072.88 as final satisfaction of the May 2 advance. Finally, on June 24, 2002, the Hospital paid KOT $2,000 to repay the balance of Kitchenmaster's May 30 advance of $40,000.

On June 26, 2002, the Hospital filed its chapter 11 petition. On July 12, 2002, without Court approval, Kitchenmaster made one last $60,000 advance to the debtor and now claims that this payment should be set off against any preference judgment entered against him.

It is undisputed that Kitchenmaster authorized all these transfers by debtor to himself and KOT. Kitchenmaster testified that he understood there were other creditors that went unpaid when

---

[9] Loan number 40032285 matured on January 30, 2002.

[10] Kitchenmaster testified that he intended to create a $100,000 "pad" with the debtor's "repayments" which would be available to loan back to the Hospital.

[11] Loan number 4003261 matured in thirty days, June 2, 2002.

5

he authorized debtor to pay himself back   Indeed, Kitchenmaster candidly admitted that he feared funds would be paid out to someone else and there would be no money for payroll.  At the time of the transfers, the debtor was not indebted to Halstead Bank or KOT under any loan agreement or promissory note.[12]  None of Kitchenmaster's advances or loans to the Hospital were documented as such in the Hospital's corporate records and there were no promissory notes or loan documents memorializing the terms of Kitchenmaster's loans to the Hospital.

### **Kitchenmaster**

Kitchenmaster testified that he has been a businessman since 1945.  Though retired now, in his career he has managed oil and gas properties, racetracks, and publishing enterprises.  This was his first foray into the healthcare industry and he professes to have undertaken this effort out of civic concern for the preservation of the Halstead Hospital and Hertzler Clinic, two of the principal employers in this small Kansas community.  He testified that he considered the various payroll advances to be loans notwithstanding that they were recorded on the debtor's books as capital contributions.  Kitchenmaster envisioned a floating kitty of $100,000 to $150,000 upon which he could rely as a cushion against payroll shortfalls.  He could draw on the kitty and quickly replenish it from hospital insurance and Medicare receipts.

During Kitchenmaster's presence at the facility, the Hospital paid no debt service on  its long-term obligations.   The debtor defaulted on a promissory note to Halstead Hospital, Inc. and a $1.6 million default judgment was entered against the debtor in April 2002.[13] Upon assuming management of the Hospital in August 23, 2001, and in an effort to cut operating costs,

---

[12]  *See* Pretrial Order, p. 5-6.

[13]  *See* Pretrial Order, p. 7-8.

6

Kitchenmaster testified to reviewing the Hospital's contracts and making determinations to "break" those contracts that contained unfavorable terms.[14] From August 2001 through June 2002, Kitchenmaster directed that certain obligations and creditors of the debtor not be paid.[15] Joyce Stein, the Hospital's payables clerk and a 39-year employee, testified that from the time Peak took over management of the facility, all payment requests were routed through Kitchenmaster for authorization and no payments could be made without his approval.

The Hospital failed to pay withholding taxes to both the Internal Revenue Service (IRS) and the Kansas Department of Revenue (KDOR). While the Hospital would cut the checks to the IRS, Kitchenmaster would direct that the checks be held indefinitely.[16] Each biweekly payroll of approximately $300,000 included a tax and FICA component of approximately $75,000. The IRS filed a proof of claim on September 6, 2002 for $657,038.07 representing unpaid withholding for the period ending March 31, 2002 as well as for the period from April 1 to June 26, 2002, plus penalties.[17] The KDOR filed a proof of claim on March 25, 2004 for unpaid prepetition withholding and penalties of $23,648.06.[18]

Also withheld, but unpaid, were the employees' group health insurance premiums. Although Kitchenmaster denied knowledge of it, the Hospital would withhold the health insurance premiums from employee paychecks and cut a premium check to the insurance provider, Coventry Health

---

[14] Some of these contracts were service or maintenance contracts on medical equipment.

[15] *See* Pretrial Order, p. 7.

[16] *See* Ex. 30. Joyce Stein testified to her notations made on check requests where Kitchenmaster directed her to hold payment of payroll taxes.

[17] *See* Proof of Claim No. 64 (amending claim no.1 and 39).

[18] *See* Proof of Claim No. 318 (amending claim no. 40).

7

Care. At Kitchenmaster's direction, however, none of the checks was sent for the period January 2002 - April 2002, and, after January of 2002, hospital employees had no health insurance.[19] The employees did not discover the loss of their health insurance coverage until after Mr. Brown was appointed trustee.

Kitchenmaster was an insider at all relevant times.[20] Through Peak Management, Kitchenmaster took over management of the Hospital on August 23, 2001 and became its chief executive officer upon exercising the purchase option in mid-November, 2001. Later, when Barry Nelson was hired as chief executive officer in February, 2002, Kitchenmaster remained Chairman of the Board of Trustees of the Hospital. During the pendency of the bankruptcy, after Kitchenmaster attempted to terminate the Board and the chief executive officer, he was ordered to refrain from disrupting or interfering with the business operations of the Hospital.[21]

KOT is a Kansas corporation that was organized in 1977 and is currently in good standing. Kitchenmaster owns 98% of KOT and is its president. KOT has employees, files tax returns and maintains a separate bank account. Kitchenmaster described KOT's business as "oil lease management." KOT made no payroll or other advances directly to the debtor.

### The Chapter 11 Trustee

Mr. Brown comes to this Court with a wealth of experience as a chapter 11 trustee. He is a certified public accountant and holds a law degree. He has previously served in a trustee capacity in bankruptcy cases in other divisions of this Court as well as in the bankruptcy courts sitting in

---

[19] In April 2002, the employees' health insurance coverage was terminated retroactive to January 2002. *See* Pretrial Order, p. 8. *See also* Ex. 29.

[20] *See* Pretrial Order, p. 3; 11 U.S.C. § 101(31)(A).

[21] Dkt. 81.

Louisiana. He has had particular experience with nursing homes and medical clinics.

Mr. Brown's examination of the books and records of the hospital revealed that the chief financial officer had maintained separate sets of books: one for the use of the creditors and the other for internal purposes. Mr. Brown stated that after his appointment, he worked closely with the U.S. Department of Labor in its investigation of the lapse of the employee health insurance. He filed a proof of loss with the Cincinnati Insurance Companies, debtor's director and officer carrier, seeking some $455,000 on behalf of the employees on account of unremitted premiums for health, life, cancer, and disability coverage. He also made claim for unremitted 401k and medical savings account payments and dental plan payments. He also determined that, after the Hospital allowed the medical insurance coverage to lapse, it instituted a self-insurance plan whereby it committed to pay any health care claims of the employees. Over $208,000 in employee claims were unpaid. As noted above, most employees had no idea of the lack of health coverage until Mr. Brown became trustee and disclosed this information to them.

**Debtor's Insolvency**

The defendants assert that the debtor was solvent at the time of each transfer. Kitchenmaster testified that the facility, if run properly, was worth $30 million based upon a loan commitment he received from Meridian Capital Group. This entity offered to loan the Hospital $9,250,000 at 15 per cent interest provided debtor could supply it with a valid $30 million appraisal. Because the original schedules only evidenced $6.5 million in debt, Kitchenmaster believes the hospital to have been solvent at all times.[22] Unfortunately, the Meridian Group's retained appraiser, David Craig, concluded that the facility's real estate and improvements, exclusive of equipment value, were worth

_____

[22] Although not entirely clear, Kitchenmaster apparently suggests that the schedules he reviewed for debtor's bankruptcy filing reflected liabilities of $6.5 million. The first schedules actually filed with the court on July 12, 2002, reflect liabilities of $10,968,202. Dkt. 23.

9

only $620,000 as of July of 2002.[23] The equipment was valued for liquidation purposes at $118,000. Ultimately, the debtor amended its schedules to set the total debt in excess of $12 million, a figure that Kitchenmaster says is high.[24] In addition, he argues that Harvey County valued the real estate for ad valorem tax purposes in 2000 at $13.5 million.[25] He further argues that the facility is very valuable based upon his comparing it to other, unspecified hospitals in Kansas.

A review of the schedules and statement of financial affairs filed by the debtor on July 12, 2002 paints a very different picture. The debtor valued its own real estate at $2,794,650 and its personal property assets at $3,244,777, for a total asset value of $6.039 million. The debtor scheduled debts and liabilities of $9,229,428, of which $7.718 million was for general unsecured claims. Bearing in mind that Kitchenmaster was involved in management and actively conferring with debtor's counsel in the direction of the bankruptcy case, the Court finds these values more persuasive than his "hindsight" estimate of the facility's value in defense of a preference complaint.

The December 31, 2001 independent audit of the Hospital's financial statements suggests that the Hospital's net worth was a negative $4.8 million. The liabilities were two times the amount of assets. As Mr. Brown noted, it is significant that the independent auditors were unable to express an opinion on the financial statements because certain factors "raise substantial doubt about the Hospital's ability to continue as a going concern."[26] Even if we interpolate into that balance sheet the "agreed" valuation of the property at $3.5 million, the hospital's liabilities still outstripped its

_____

[23] Even this valuation assumed a period of two years to market the property.

[24] Dkt. 86 filed August 23, 2002.

[25] After a tax appeal by the Hospital, that value was reduced to $3.5 million pursuant to an agreement between the Hospital and the County.

[26] Ex. 27.

10

assets by more than a million dollars at year-end of 2001. Supporting this conclusion is Mr. Brown's opinion that, at present, the unsecured creditors have little prospect of receiving any dividend in this case. Mr. Brown also testified that the monthly financial statements supported the fact that the Hospital lost $200,000 a month from August 2001 through December 2001. From January 2002 to June 2002 the monthly operating loss increased to $300,000. The patient census never reached ten. The initial financial report filed with the Court by the debtor for the six months ending June 30, 2002 showed an operating loss of $2.1 million.[27] Debtor reported liabilities of $8.9 million and assets of $3.7 million.

The trustee had the benefit of the presumption of insolvency of the debtor for the initial 90 days preceding the petition date and these defendants showed nothing to meet that presumption. The trustee had the burden to prove insolvency during the balance of the one year look-back period. The Court concludes that a preponderance of the evidence supports a finding that, at all times relevant to these transactions, the sum of the debtor's debts was greater than the aggregate of its assets at fair value. In addition, the Court notes that the parties stipulated that from and after August 19, 2001, the debtor was not paying its debts as they came due.[28]

The parties have stipulated to various other facts that will be discussed as they become pertinent to the Court's analysis of the applicable law.

## CONCLUSIONS OF LAW

**A.    Kitchenmaster's and KOT's Alter Ego Argument**

Before analyzing the above findings of fact under the applicable law of § 547 and § 548, the

---

[27] Ex. 26.

[28] *See* Pretrial Order, p. 9.

11

Court will first address defendants' alter ego "defense" raised for the first time in their trial brief.[29]

Defendants contend that Kitchenmaster and KOT should be treated as alter egos because of Kitchenmaster's 98 percent ownership and domination of KOT. Under defendants' theory, the payments made by debtor to KOT should be deemed to be payments made to Kitchenmaster, and the Court should disregard KOT's separate corporate existence. The chapter 11 trustee objected to this belated defense and filed a motion to strike, because the defense was not outlined in the Pretrial Order.[30] The Court heard brief argument on the motion to strike and reserved its ruling to the close of the evidence. If the Court accepts this defense, Kitchenmaster and KOT would be treated as one and the same, thereby impacting the analysis and calculation of the amount of defendants' potential liability under § 547.

Defendants cite no legal authority for this Court to disregard KOT's corporate existence under these circumstances.[31] The Court has reviewed Kansas law to determine whether it should pierce the corporate veil and disregard KOT's separate existence. The Court concludes that it should not.

First and foremost, the power to pierce the corporate veil and disregard the corporate entity is ordinarily used to *prevent* fraud or an injustice against third parties.[32] The power to disregard the corporate entity is exercised to impose liability on an individual that seeks to hide behind the

---

[29] Dkt. 42.

[30] Dkt. 43.

[31] *See Amoco Chemicals Corp. v. Bach,* 222 Kan. 589, 593, 567 P.2d 1337 (1977) (A corporation and its stockholders are presumed separate and distinct, whether the corporation has many stockholders or only one. [citations omitted])

[32] *Kvassay v. Murray*, 15 Kan. App. 2d 426, 436, 808 P.2d 896 (1991).

12

corporate form.[33]  That is not the situation here.  In this proceeding, defendants advocate "reverse piercing" to vindicate their own interests.  The Court simply cannot find that the doctrine has been or should be applied in this fashion.[34]

Moreover, the evidence presented at trial would not support a determination to pierce the corporate veil of KOT.  The Kansas courts have considered eight factors when determining whether to disregard a corporate entity.[35]  None of those eight factors is supported by the limited evidence before this Court.  To the contrary, the only record with regard to KOT was that it has observed corporate formalities and has corporate records: it is a Kansas corporation in good standing; Kitchenmaster owns a 98% interest; it has its own employees and bank account; and it files corporate tax returns.  The record is totally devoid of any evidence pertaining to the other eight factors.  Since the power to pierce the corporate veil is to be exercised reluctantly and cautiously, the Court will not pierce the corporate veil of KOT on this record.[36]  Because the Court reaches the foregoing conclusions, the trustee's motion to strike is MOOT.

---

[33] *See Pemco, Inc. v. Kansas Dept. Of Revenue*, 258 Kan. 717, 722-23, 907 P.2d 863 (1995) (noting that the corporate veil is pierced to impose liability on the corporation, not to bestow an advantage; corporation would not be permitted to pierce its own corporate veil to avoid the payment of sales tax).

[34] *See Commerce Bank, N.A. v. Liebau-Woodall & Associates, L.P.* 28 Kan. App. 2d 674, 680, 20 P.3d 88 (2001) ("Under Kansas law, a corporate entity cannot apply the alter ego doctrine as a sword to vindicate its own interests.  The veil-piercing concept is to be used solely to avoid potential injury to third parties by perpetuating fraud, illegality, or injustice worked through the legal fiction of a corporate identity."). *See also, Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1575 n. 17 (10th Cir. 1990) (rejecting reverse-piercing argument).

[35] *Kvassay*, 15 Kan. App. 2d at 437.

[36] *Amoco Chemicals Corp.*, 222 Kan. at 593. *See also, In re Martin*, 184 B.R. 985, 992-93 (M.D. Ala. 1995), *aff'd* 101 F.3d 708 (11th Cir. 1996) (rejecting creditor's argument that it did not receive more than it would have received in a chapter 7 because antecedent debt created by debtor's personal guarantee was secured because corporation that gave mortgage was the alter ego of debtor).

13

**B.      Debtor's Payments to Kitchenmaster are Preferential Transfers under § 547**

Since the Court rejects the alter ego "defense," the transfers by debtor to Kitchenmaster and KOT must be analyzed separately under § 547. The trustee seeking to avoid the debtor's payments to Kitchenmaster and KOT as preferences has the burden of proving each of the elements under § 547(b).[37]

**1.      KOT's Liability Under § 547.**

Under § 547(b) the payments to KOT are avoidable as preferential transfers if: (1) they are of an interest of the debtor in property; (2) they are to or for the benefit of a creditor; (3) they are made for or on account of an antecedent debt owed by the debtor before the transfer was made; (4) are made while the debtor is insolvent; (5) are made on or within ninety days preceding the filing of the bankruptcy petition; and (6) allow the creditor to receive more than the creditor would otherwise have received in a chapter 7 liquidation proceeding.[38]

The second and third elements are lacking as to KOT. The facts establish that KOT made no loans or advances to the Hospital and did not provide anything of value. The Hospital was in no manner indebted to KOT.[39] Kitchenmaster made the short-term payroll advances to the Hospital. KOT has no claim against the Hospital.[40] KOT cannot, therefore, be considered a creditor. Thus,

---

[37] § 547(g); *Bailey v. Big Sky Motors, Ltd. (In re Ogden)*, 314 F.3d 1190, 1196 (10th Cir. 2002).

[38] *Jobin v. McKay (In re M&L Business Mach. Co., Inc.),* 84 F.3d 1330, 1339 (10th Cir. 1996).

[39] *See In re Martin*, 184 B.R. at 991 (M.D. Ala. 1995) (To determine whether loan payment is "for or on account of" debt owed by debtor, court considers whether creditor would be able to assert a claim against the estate, absent payment.).

[40] *See* § 101(5)(A) defining "claim" as the "right to payment, whether or not such right is reduced to judgment, liquidated,unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

14

the payments to KOT are not avoidable as preferences under § 547(b).

## 2. Kitchenmaster's Liability Under § 547.

### a. Preference Analysis

Because Kitchenmaster is an insider, a one-year look-back period applies to the preference analysis of the payments to him.[41]  The other elements of § 547(b) remain the same as set forth above.  The Court has little doubt that debtor's repayment of the series of short-term loans made by Kitchenmaster resulted in Kitchenmaster receiving far more than other unsecured creditors would have received, the precise result § 547(b) was designed to prevent.[42]

The preponderance of the evidence firmly supports each of the elements of a preferential transfer.  There is no dispute that debtor made a transfer of an interest of its property (funds of the Hospital); that debtor made the transfer to or for the benefit of a creditor, Kitchenmaster; that the transfers were on account of antecedent debt (the short term loans made by Kitchenmaster); and that the transfers occurred within the one-year look-back period.[43]  The trustee also presented evidence that there will be no funds to pay general unsecured creditors due to the large amount of administrative expenses and the substantial priority claim for unpaid prepetition withholding. Kitchenmaster did not challenge this evidence and the Court therefore concludes that when

---

[41]  § 547(b)(4)(B).

[42]  *In re Moses*, 256 B.R. 641, 647 (10th Cir. BAP 2000) (The policy behind § 547(b) is to promote equality of distribution among the creditors by ensuring that all creditors of the same class receive the same pro rata share of the debtor's estate.).

[43]  The stipulated facts establish a total of seven (7) transfers, four (4) of which were made to Kitchenmaster or to the Halstead Bank for his benefit and three (3) of which were made to KOT.  All occurred within the one year prior to the Hospital's bankruptcy petition, June 26, 2002:  These transfers occurred on:  December 4, 2001 ($50,106.16); January 24, 2002 ($100,000); January 28, 2002 ($100,000 to KOT); May 31, 2002 ($38,000 to KOT); June 14, 2002 ($50,000); June 21, 2002 ($50,072) and June 24, 2002 ($2,000 to KOT).

15

Kitchenmaster received repayment in full, he received more on account of the transfers than he would have as a general unsecured creditor in a chapter 7 liquidation.

Debtor's insolvency is the only contested preference element.[44] With regard to the Hospital's two June payments to Kitchenmaster, there is a presumption of insolvency.[45] The burden shifts to Kitchenmaster to rebut this presumption. With regard to the Hospital's December 4, 2001 and January 24, 2002 payments to Kitchenmaster, the trustee has the burden of proving the Hospital's insolvency at the time these two transfers were made.

The Court is more than satisfied that the Hospital was insolvent at the time of the four transfers to Kitchenmaster based upon the record before it. The Court has before it evidence of the Hospital's financial condition at year-end 2001, immediately prior to all of the transfers save one, as well as its financial condition at the time of filing, after the dates of transfers.[46] As of December 31, 2001, the audited financial statements of the Hospital showed a negative net worth in excess of $4.5 million. Liabilities were two times the amount of assets. The auditors refused to express an opinion on the financial statements because they doubted the Hospital's viability as a going concern. It was undisputed that the Hospital was incurring monthly operating losses of $200,000 in the last quarter of 2001. The Hospital's financial condition six months later was no better. The monthly operating loss climbed to $300,000 a month during the first six months of 2002. An independent appraisal made by David Craig in conjunction with a loan commitment from Meridian Capital Group to the Hospital valued the Hospital's real estate and improvements at $620,000 at July of 2002 and

_____

[44] § 547(b)(3).

[45] *See* § 547(f) (presumption of insolvency during the 90 days prior to bankruptcy).

[46] *See In re Mama D'Angelo, Inc.*, 55 F.3d 552 (10th Cir. 1995) (approving principles of retrojection and projection permitting the use of insolvency evidence on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date).

a liquidation value of $118,000 on the equipment, far below the $30,000,000 value placed upon the Hospital by Kitchenmaster. The original bankruptcy schedules filed by the Hospital reflect liabilities of nearly $11,000,000 which Kitchenmaster contends is high and assets slightly in excess of $6,000,000 which Kitchenmaster contends is low. Kitchenmaster unsubstantiated opinion of the Hospital's value is simply not credible when viewed in light of the fact that he has no prior experience in the health care industry and came forward with no values for comparable health care facilities. The preponderance of the evidence clearly shows that the Hospital was insolvent at the time of the transfers to Kitchenmaster and the Court so finds.

Because each of the elements of § 547(b) are satisfied, the Court concludes that the four loan repayments made by the Hospital to Kitchenmaster are avoidable preferences, unless Kitchenmaster can avail himself of one of the exceptions in § 547(c). Here, Kitchenmaster invokes two possible exceptions to preference liability, § 547(c)(1) and § 547(c)(4). Kitchenmaster has the burden of establishing one of the exceptions.[47]

### b. The Substantially Contemporaneous Exchange Exception, § 547(c)(1)

Under § 547(c)(1) the trustee may not avoid a preferential transfer to the extent the transfer was: (1) *intended* by the debtor and the creditor to be a contemporaneous exchange for new value given to the debtor; and (2) was *in fact* a substantially contemporaneous exchange.

"New value" is defined in the preference statute as:

> . . . money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, *but does not include an obligation substituted for an existing obligation.*[48]

---

[47] § 547(g).

[48] § 547(a)(2) (Emphasis added.).

The rationale for this exception to the trustee's preference avoiding power was explained in

*In re Lyon*:[49]

> The first exception is a simple one, excepting a transfer that is really not on account of an antecedent [debt]. Literally, the transfer must have been intended by the debtor and the creditor to have been a contemporaneous exchange for new value and "in fact a substantially contemporaneous exchange." No doubt a purchase by the debtor of goods or services with a check, if deemed to be on credit by state law, would be insulated by this exception. Though strictly speaking the transaction may be a credit transaction because the seller does not receive payment until the check is cleared through the debtor's bank, it is generally considered and intended to be a contemporaneous transaction, and assuming the check is promptly deposited and cleared, is in fact substantially contemporaneous.[50]

Here, the defendants limit their § 547(c)(1) defense to the May 30, 2002 $40,000 advance and the May 31, 2002 transfer of $38,000 to KOT (the "check-swap"), presumably because of the close proximity between the transfer and advance and therefore meets the "substantially contemporaneous" requirement.[51] It is undisputed that Kitchenmaster intended to make short-term loans to the Hospital and that the Hospital's transfers were to repay, in part or in full, those short-term loans. This evidence is fatal to Kitchenmaster's § 547(c)(1) defense because it indicates that the Hospital and Kitchenmaster never *intended* the transfer to be a contemporaneous exchange.[52]

---

[49] *Barr v. Reneau (In re Lyon)*, 35 B.R. 759, (Bankr. D. Kan. 1982).

[50] *Id.* at 762.

[51] *See* Defendants' Trial Brief, p. 10-11. There were no further advances made by Kitchenmaster after the May 31, 2002 $38,000 payment except for the post-petition advance of $60,000 on July 12, 2002. Even if this Court were to conclude that this $60,000 advance constituted new value, it would not be "substantially contemporaneous" to qualify as a preference exception under § 547(c)(1).

[52] *See Wasserman v. Village Associates (In re Freestate Management Services, Inc.)*, 153 B.R. 972, 984 (Bankr. D. Md. 1993) (Where intent and expectation of the parties was that there would be a short-term loan, not a contemporaneous exchange and parties documented the short term loan with a promissory note, the contemporaneous exchange defense was unavailable; 24 days passed between the making of the loan and its repayment.). *But see In re Lease-A-Fleet, Inc.*, 155 B.R. 666 (Bankr. E.D. Pa. 1993) (A loan which contemplates almost immediate

18

Here, the Hospital's $38,000 transfer was to KOT, a non-creditor, as a purported partial repayment of the previous day's $40,000 advance by Kitchenmaster. Even if KOT and Kitchenmaster were treated as one and the same, the satisfaction of an antecedent debt does not constitute "new value" and such a transfer is not excepted as a preference under § 547(c)(1).[53]

Moreover, because the Court has previously rejected the defendants' reverse-piercing theory, KOT and Kitchenmaster cannot be treated interchangeably as one creditor. The Court has concluded that the transfers to KOT (which includes the $38,000 transfer on May 31, 2002) are not avoidable preferences since KOT made no loan to the Hospital and has no claim against the Hospital as a creditor. Because KOT has no preference liability, the § 547(c)(1) exception is inapplicable as to KOT.

### c.    Subsequent New Value Defense, § 547(c)(4)

This brings the Court to Kitchenmaster's subsequent new value defense under § 547(c)(4). That exception to the trustee's preference avoiding power provides:

> The trustee may not avoid under this section a transfer – . . .
> (4) to or for the benefit of a creditor, to the extent that, *after such transfer*, such creditor gave new value *to or for the benefit of the debtor* – (A) not secured by an otherwise unavoidable security interest; and (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.[54]

The policy behind the subsequent new value exception is to encourage creditors to deal with troubled

---

repayment constitutes a contemporaneous exchange; creditor who advanced $14,000 and was repaid 11 days later was contemporaneous exchange.)

[53]  *See Manchester v. First Bank & Trust Company (In re Moses)*, 256 B.R. 641 (10th Cir. BAP 2000) (Satisfaction of antecedent debt does not qualify as "new value" within the meaning of § 547(c)(1) exception to preference as "contemporaneous exchange for new value."); Lawrence P. King, 5 COLLIER ON BANKRUPTCY ¶ 547.02[2], p. 547-12 (15th rev. ed. 2005).

[54]  § 547(c)(4) (Emphasis added.).

Case 04-05142    Doc# 45    Filed 11/16/05    Page 19 of 26

businesses so as to avoid possible bankruptcy.[55]  For the new value defense to apply, there must be

an avoidable preferential payment and then a new value advance, on account of which the debtor did

not make an otherwise unavoidable transfer.

The Hospital's preferential transfers (loan repayments) cannot be offset with Kitchenmaster's

*prior* advances of new value.[56]  Here, the Hospital's loan repayments may be offset with

Kitchenmaster's subsequent advances.  The first $100,000 advance made by Kitchenmaster on

November 29, 2001, prior to the first loan repayment on December 4, 2001, does not constitute

subsequent new value and may not be  applied to offset the preference under § 547(c)(4).  And as

discussed below, Kitchenmaster's last advance of $60,000 made a week after the Hospital filed its

chapter 11 petition is also unavailable to offset the prepetition loan repayments.  Thus, the Court will

consider the remaining advances of new value made on December 13, 2001 ($100,000); May 2, 2002

($100,000); and May 30, 2002 ($40,000) and disallow the trustee's avoidance of prepetition loan

repayments to the extent of these subsequent advances as permitted by § 547(c)(4).  The table below

summarizes the preferences and subsequent advances that are in play under the new value defense.

| Date | Preference Amount | Subsequent Advance |
|------|-------------------|--------------------|
| 12/4/01 | $   50,106.16 | |
| 12/13/01 | | $ 100,000 |
| 1/24/02 | $ 100,000.00 | |
| 1/28/02 | $ 100,000.00 (to KOT) | |
| 5/2/02 | | $ 100,000 |
| 5/30/02 | | $   40,000 |
| 5/31/02 | $   38,000.00 (to KOT) | |
| 6/14/02 | $   50,000.00 | |
| 6/21/02 | $   50,072.88 | |
| 6/24/02 | $     2,000.00 (to KOT) | |

[55]  *In re Kroh Bros. Development Co.*, 930 F.2d 648, 651 (8th Cir. 1991).

[56]  *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)*, 198 B.R. 365 (Bankr. D. Kan. 1996).

### d.     Kitchenmaster's Post-Petition $60,000 Advance

Kitchenmaster argues that he should be given credit for his post-petition $60,000 advance on July 12, 2002 to the debtor, thereby further reducing his preference liability. The Court rejects this argument. The case law indicates that the subsequent new value defense in § 547(c)(4) is only available to the extent of new value given *prepetition*. This same argument was addressed by *In re Bellanca Aircraft Corp.*,[57] and rejected.

> The bankruptcy court held, and the district court affirmed, that any advances of new value AGCO made to Bellanca after Bellanca filed its bankruptcy petition could not be used to offset pre-petition preferences from Bellanca to AGCO. AGCO asserts that this holding is incorrect as a matter of law because under section 547(c)(4) post-petition advances of new value may be applied to offset preferential transfers.
>
> AGCO first argues that by its terms, section 547(c)(4) is not limited to advances of new value made before the debtor filed its petition: "The trustee may not avoid * * * a transfer to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value * * *." § 547(c)(4) (emphasis added). Emphasizing the expansive words "after such transfer", however, is erroneous, because of the significant subsequent words: "to the extent that * * * such creditor gave new value to or for the benefit of the debtor * * *." Id. (emphasis added). These words imply that subsequent advances of new value are only those given pre-petition, because any post-petition advances are given to the debtor's estate, not to the debtor. [citations omitted.][58]

Moreover, this $60,000 post-petition advance by Kitchenmaster to the debtor was not made pursuant to a valid Court order. Indeed, no application to approve this post-petition unsecured short-

---

[57]    *Bergquist v. Anderson-Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275 (8th Cir. 1988).

[58]    *Id.* at 1284. *Accord, In re Lease-A-Fleet, Inc.*, 155 B.R. 666, 684 (Bankr. E.D Pa. 1993) (creditor would not be permitted to utilize post-petition advances to the debtor to offset pre-petition preferential transfers); *In re Jolly N, Inc.*, 122 B.R. 897 (Bankr. D. N.J. 1991) (post petition advances of new value may not be applied to offset preferential transfers); *In re Sharoff Food Service, Inc.*, 179 B.R. 669 (Bankr. D. Colo 1995) (post-petition advances are given to the debtor's estate, not the debtor, and should not be included in the subsequent new value calculation).

21

term loan was ever made.[59]  Accordingly, this advance might be, at best, an administrative expense of the estate.  Kitchenmaster has not made an application to allow the expense and it appears that even if such an application were to be allowed, the allowance might not be paid in full.[60]  In this scenario, the Court will not allow the post-petition advance as a "set-off" to any prepetition preference.

**e.      Calculation of Kitchenmaster's Preference Liability**

The bankruptcy court in *In re Liberty Livestock Company* set forth the manner in which a creditor's preference liability is calculated where the creditor has advanced subsequent new value and is entitled to offset the preferences.[61]

Following the road map laid out in *Liberty Livestock,* this Court calculates Kitchenmaster's preference liability on the four (4) loan repayments to him.

| Preferential Payments | Less Subsequent New Value | **Balance** |
|---|---|---|
| $50,106.16 (12/4/01) | $100,000 (12/13/01) | 0 |
| $100,000 (1/24/02) + 0 = $100,000 | $100,000 (5/2/02) + $40,000 (5/30/02) = $140,000 | 0 |
| $50,000 (6/14/02) + $50,072.88 (6/21/02) + 0 = $100,072.88 | 0 | **$100,072.88** |

The trustee may avoid these four preferential transfers in the amount of $100,072.88.

**C.      Debtor's Payments to KOT and Kitchenmaster are § 548 Fraudulent Transfers**

Even though KOT has no preference liability to the trustee under § 547, it may be subject to

---

[59]  *See* § 364.

[60]  *See* § 503(b)(1) and § 507.

[61]  198 B.R. at 378-79.

the trustee's fraudulent transfer claim under § 548. And while the Court concludes that Kitchenmaster has a preference liability, that conclusion does not preclude a determination that the Hospital's transfers to him may also be avoided as fraudulent transfers.[62]

Section 548(a)(1)(A) provides:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily –
>
> (A) made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . . , indebted;

As with the preference analysis, the evidence unequivocally shows that the Hospital transferred an interest in its property (*i.e.* funds from its bank account) and that all seven transfers were made within one year of the Hospital's bankruptcy petition, June 26, 2002.[63] The only element of this claim in controversy is whether the Hospital made the transfers to KOT and Kitchenmaster with "actual intent to hinder, delay, or defraud" the Hospital's other creditors.

The Court has little hesitancy in concluding that the trustee has met his burden. Because the requisite intent to hinder, delay, or defraud creditors is rarely admitted by a debtor, the courts look to circumstantial evidence establishing badges of fraud. Those factors include: (1) whether the transfer was to an insider; (2) whether the debtor retained possession or control of the property after the transfer; (3) concealment of the transfer; (4) pending or threatened litigation against the debtor

---

[62] *Murphy v. Nunes (In re Terrific Seafoods, Inc.)*, 197 B.R. 724, 732 (Bankr. D. Mass. 1996) citing *Dean v. Davis*, 242 U.S. 438, 444, 37 S.Ct. 130, 61 L.Ed. 419 (1917) (A transaction may be invalid both as a preference and as a fraudulent transfer).

[63] The three transfers to KOT were made: January 28, 2002 ($100,000); May 31, 2002 ($38,000); and June 24, 2002 ($2,000). The four transfers to Kitchenmaster were made: December 4, 2001 ($50,106.16); January 24, 2002 ($100,000); June 14, 2002 ($50,000) and June 21, 2002 ($50,072.88 ).

at the time of transfer; (5) a transfer of substantially all of the debtor's assets; (6) absconding by the debtor; (7) removal or concealment of assets; (8) reasonably equivalent value in exchange for the transfer; (9) the debtor's insolvency at the time of the transfer; (10) the proximity in time of the transfer to the incurrence of a substantial debt; and (11) a transfer of substantial business assets to a lienor followed by a subsequent transfer of such assets to an insider of the debtor.[64]  Some of these factors are not implicated by the circumstances of this case.  Others are clearly present.

While KOT is not legally an insider of the Hospital under § 101(31), it is significant that Kitchenmaster, who is an insider, controlled the debtor when the transfers were made and was the 98% owner and  president of KOT.  He effectively controlled both the debtor and the transferee, KOT.  Kitchenmaster  had the ability to move funds among the Hospital, KOT and himself, at his discretion.  Thus, while the Hospital did not retain actual possession or control of the funds after the transfers, Kitchenmaster certainly retained the ability to transfer funds back and forth between the Hospital and KOT and himself.

The transfers to KOT and Kitchenmaster were not concealed in the sense that they were hidden or unrecorded in the Hospital's records, but there was no documentation or record that the Hospital was indebted to KOT or Kitchenmaster.  The transfers purported to be loan repayments yet KOT had not advanced any funds to the Hospital and was not a creditor of the Hospital.  The loans from Kitchenmaster were not recorded on the Hospital's books as such but were documented as capital contributions.  The Hospital did not receive reasonably equivalent value, or any value, in exchange for the transfers to KOT.  The Hospital, through Kitchenmaster, did conceal from the employees the fact that their health insurance coverage had lapsed due to nonpayment of the

---

[64] *In re Kelsey*  270 B.R. 776, 782 (10th Cir. BAP 2001), citing *Taylor v. Rupp (In re Taylor)*, 133 F.3d 1336, 1338-39 (10th Cir. 1998).

Case 04-05142    Doc# 45    Filed 11/16/05    Page 24 of 26

premiums.

As discussed previously in this opinion, the Hospital was insolvent at the time the transfers were made to KOT and Kitchenmaster. And these transfers were occurring as the Hospital incurred liability for tax obligations and employee health insurance benefits that Kitchenmaster withheld payment of and mounting operating losses. It is apparent to the Court that instead of remitting payment for these obligations, Kitchenmaster instead diverted the payments to KOT and himself.

In fact, the Court views this case as one of those rare instances where the debtor has effectively admitted that the transfers were made with the intent to hinder and delay creditors. Kitchenmaster, utilizing his position of control, chose which obligations and creditors of the Hospital to pay. Kitchenmaster reviewed on a daily basis the previous day's expenses and deposits so he was intimately aware of the Hospital's daily cash position. He reviewed check requests on a daily basis and determined which checks would be paid and which checks would be held. Kitchenmaster directed and authorized the Hospital to pay himself and his company, KOT, knowing full well that he was getting paid while the Hospital was "cash-poor." He chose not to pay tax obligations and, more damningly, employee insurance premiums. He knew that the employees would leave and quit if they did not get paid. In order to fund the payroll, Kitchenmaster testified that it was his plan to make short terms loans and "recycle" these funds so that he could fund future payrolls. The payroll would not get paid if he did not get repaid on these short terms loans. In a moment of brutal honesty, Kitchenmaster admitted that he feared the Hospital would pay out its funds to someone else, leaving no funds for the payroll, if he did not transfer the money to KOT and himself. Kitchenmaster knew and understood that there were other creditors going unpaid when the Hospital was paying himself and his company. He had no answer as to how other creditors would be paid.

On this record, the Court concludes without doubt that the transfers to KOT and

25

Kitchenmaster were made with the actual intent to hinder or delay repayment to the Hospital's other creditors. Pursuant to § 548(a)(1)(A), the trustee is entitled to avoid as fraudulent transfers the three payments to KOT totaling $140,000 and the four payments to Kitchenmaster totaling $250,179.04.

## CONCLUSION

Judgment should be entered in favor of the trustee on his adversary complaint. The Hospital's loan repayments to Kitchenmaster were preferential transfers under § 547(b) and may be avoided, but Kitchenmaster's preference liability is reduced by the subsequent new value, provided by Kitchenmaster to the Hospital. Judgment should be entered against Kitchenmaster in the amount of $100,072.88 under § 547(b) and (c)(4).

Further, the Hospital's transfers to KOT and Kitchenmaster were made with actual intent to hinder and delay the Hospital's other creditors and were fraudulent transfers under § 548(a)(1)(A). Judgment should be entered against KOT in the amount of $140,000 and against Kitchenmaster in the amount of $250,179.04.

The Court notes that the trustee may not recover the avoided transfers twice from Kitchenmaster as both the preference amount and the fraudulent transfer amount. Kitchenmaster's maximum liability shall be $250,179.04. A Judgment on Decision will issue this day.

# # #

26